## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

KACI HICKOX,

Plaintiff,

v.

CHRISTOPHER JAMES CHRISTIE, et al.,

Defendants.

Civ. No. 15-7647 (KM)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 ("Section 1983"). The plaintiff, Kaci Hickox, is a nurse who cared for individuals affected by the 2014–16 Ebola epidemic in West Africa, specifically in Sierra Leone. Upon her return to the United States, Ms. Hickox was stopped at Newark Liberty International Airport while her health was monitored. Hickox alleges that this quarantine, which lasted approximately 80 hours, violated her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. Hickox also alleges that defendants committed the New Jersey common law torts of false imprisonment and false light.

Hickox sues various State officials involved in her quarantine: Chris Christie, the Governor of New Jersey; Mary O'Dowd, then the Commissioner of the New Jersey Department of Health ("DOH"); Christopher Rinn, Assistant Commissioner of the Division of Public Health Infrastructure, Laboratories and Emergency Preparedness of the DOH; and Gary Ludwig, the Service Director of the Communicable Disease Service of the DOH.

It is plain that Ms. Hickox was upset not only by the quarantine itself, but by what she saw as an inefficient, unfriendly, and opaque process. As she sees it, there was a lack of communication regarding the quarantine and what would happen to her. It is also clear that Hickox disagreed with the assessment

1

of her medical condition throughout the quarantine process.

Bad science and irrational fear often amplify the public's reaction to reports of infectious disease. Ebola, although it has inspired great fear, is a virus, not a malevolent magic spell. The State is entitled to some latitude, however, in its prophylactic efforts to contain what is, at present, an incurable and often fatal disease.

Nurse Hickox lent her medical skills to a humanitarian effort to relieve the suffering of people she had never met. Her courage and service perhaps merited a warmer welcome home. The issue here, however, is different: I am called upon to determine whether Hickox has stated a legally cognizable claim for damages under the Constitution or the common law. Now before the Court is the defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, I will grant the motion to dismiss the federal claims on grounds of qualified immunity. Public health officials responsible for containing the spread of contagious disease must be free to make judgments, even to some degree mistaken ones, without exposing themselves to judgments for money damages. As to the state causes of action, however, I will deny the motions to dismiss.

## I.   FACTUAL BACKGROUND

For purposes of this motion to dismiss only, I take the allegations of the complaint to be true. *See* Section II, *infra*.

**Events leading up to Hickox's quarantine**

The 2014–16 Ebola outbreak in West Africa resulted in the deaths of more than 11,000 people. *See* Medicins Sans Frontieres, Ebola, www.msf.org/en/diseases/ebola. The Ebola virus is spread through direct contact with the body fluids of a symptomatic person or with contaminated objects, such as needles. (*Id.* ¶ 16) Symptoms commonly appear within 8 to 10 days of exposure, although it can take up to 21 days. (*Id.* ¶ 18)

Ms. Hickox, a trained nurse, has experience working for Medecins Sans Frontieres ("MSF"), also known as "Doctors Without Borders," in places

including Uganda, Nigeria, and Sudan. (ECF no. 1 ("Cplt.") ¶ 6) From September 23, 2014, until October 22, 2014, Hickox served as a Medical Team Leader at the Ebola Treatment Unit at Bo, Sierra Leone. (*Id.*) There, Hickox cared for patients with Ebola, and also managed and trained other workers. (*Id.* ¶ 21) During her time in Sierra Leone, Hickox followed MSF protocols, such as the wearing of protective equipment, intended to prevent the spread of Ebola. (*Id.* ¶ 23)

On October 22, 2014, just as Hickox was leaving Sierra Leone, Governor Christie announced that he had signed Executive Order 164, which created a statewide Ebola Preparedness Plan ("EPP"). (*Id.* ¶ 27) The EPP provided that as of October 16, 2014, active screening had been implemented for passengers arriving from West African countries. *Id.*; *see* EPP, available at http://nj.gov/governor/news/news/552014/pdf/20141022a.pdf.[1] The screening for such passengers was to include "[t]emperature checks," "[v]isual inspection for symptoms," and an assessment of their "[h]istory of risk exposure." (*Id.* ¶ 27; EPP at 1) The EPP stated that "[i]f CDC advises DOH of a traveler who is asymptomatic but has some high risk of exposure, DOH will determine whether that traveler will be subject to State quarantine." EPP at 2.

If an asymptomatic individual to be quarantined lives within 100 miles of Newark Airport, he or she will be taken home. (Cplt. ¶ 27; EPP at 2) An individual who lives outside that radius will be placed in a "temporary housing arrangement." (*Id.*) Symptomatic travelers are to be immediately transferred to a designated hospital. (Cplt. ¶ 27)

---

[1]     Although the EPP is not attached to the complaint, it is relied upon therein, and/or is a publicly available, official document. I therefore consider it. *See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.),* 768 F.3d 284, 291 (3d Cir. 2012) ("[D]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim.") (internal quotations and citation omitted); *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999)(a court may take notice of public records on a 12(b)(6) motion).

**Friday October 24, 2014**

Hickox left Sierra Leone on October 22, 2014, and flew to Brussels, where she spent two days before returning to the United States. (*Id.* ¶ 26) She landed at Newark airport around 12:30 p.m. on Friday, October 24. (*Id.* ¶ 28) At the airport immigration checkpoint, Hickox told the officer her point of origin was Sierra Leone. (*Id.* ¶ 29) She was then transferred to the CDC Quarantine Station at the airport. (*Id.*) At the Quarantine Station, her temperature was taken and found to be 98.6° F, *i.e.*, normal. (*Id.* ¶ 31) Hickox was questioned by multiple people, including one from the CDC. Those individuals wore protective clothing when they were in her presence. (*Id.* ¶¶ 32-35) After about 90 minutes, Hickox was given water and a snack, and was permitted to contact her family. (*Id.* ¶ 37)

Around 2:30 p.m., approximately two hours after Hickox arrived at Newark airport, she was told that she might be quarantined and should await the decision of the DOH. (*Id.* ¶ 40) At around 3:00 p.m., defendant Ludwig informed Hickox by cell phone that DOH had decided to quarantine her. (*Id.*) Hickox objected. (*Id.* ¶ 41)

At approximately 4:30 p.m. the same day, New Jersey Governor Christie, along with the Governor of New York, Andrew Cuomo, announced that there would be additional screening for individuals arriving at Newark Airport and John F. Kennedy Airport. (*Id.* ¶ 42) That additional screening was to include mandatory quarantine for individuals who had had contact with any individual infected with Ebola in Liberia, Sierra Leone or Guinea. (*Id.*) Individuals who had traveled to those countries but did not have direct contact with such a person would be actively monitored and quarantined, if necessary, depending on the facts of the case. (*Id.*) At the press conference, Governor Christie stated that a healthcare worker (not explicitly identified as Hickox) had been quarantined and that O'Dowd was monitoring her condition. (*Id.* ¶ 45)

At some point in the late afternoon or early evening, Hickox's temperature was taken with a temporal (forehead) thermometer, which indicated that she had a fever. (*Id.* ¶ 49) Hickox did not feel feverish and

4

believed that the thermometer reading was inaccurate. (*Id.*) Soon after, Hickox was moved into a room by herself with someone stationed outside. (*Id.* ¶ 50)

Hickox was informed that she needed a medical evaluation because of her fever. (*Id.* ¶ 51) Around 6:00 p.m., she was transported to University Hospital in Newark and placed in an isolation tent with someone stationed outside. (*Id.* ¶ 53) The tent had a portable toilet but did not have a shower. (*Id.* ¶ 54) Hickox was cold and requested more blankets, which she received. (*Id.*) The tent did not have a television, but Hickox was allowed to bring in her cell phone, though she found reception to be unreliable. (*Id.* ¶ 55)

At the hospital, Hickox's temperature was taken several times, both temporally and orally. Initially, the temporal thermometer showed a temperature of 101.1°, while an oral thermometer read 99.1°. (*Id.* ¶ 56) Shortly thereafter, Hickox's blood was drawn, and her temperature was taken again. The temporal thermometer read 102°, but again the oral thermometer did not reflect a fever. (*Id.* ¶ 57) At around 8:30 p.m., Hickox's temperature was again taken with an oral thermometer which read 98.1°. (*Id.* ¶ 59) At around 9:50 p.m., the temporal thermometer read 100.5°, and the oral thermometer read 98.2°. (*Id.* ¶ 60) At around 11:30 p.m., Hickox's temperature was taken with a temporal thermometer which read 99.5°. (*Id.* ¶ 61) A short time later, it was taken with an oral thermometer which read 98°. (*Id.*) Another oral reading soon afterward came in at 98.6°. (*Id.*) Thereafter, Hickox's temperature readings remained at or below 99.5°, regardless of the method used. (*Id.*)

At some time on October 24, 2015—it is not clear exactly when—O'Dowd signed an "Administrative Order Declaring Quarantine and Isolation of Kaci Hickox." (A copy is attached to the complaint, ECF no. 1-1 pp. 2-3) The Order invokes the powers of the DOH under N.J. Stat. Ann. § 26:4 *et seq.* and N.J.A.C. § 8:57 *et seq.* (quoted *infra*). The order's "Whereas" clauses state administrative findings that Ebola is a contagious, often fatal disease, with an incubation period of up to 21 days; that CDC has instituted enhanced entry screening for travelers from Ebola-infected areas, including Sierra Leone; that Ms. Hickox had had contact with infected individuals as recently as October

5

20, 2014, and was at high risk of exposure; that at the airport she experienced the onset of a fever; that she was currently in isolation at University Hospital for care and monitoring; that her medical status was uncertain; and that therefore the DOH could not rule out that she was infected and posed a danger to public health.

The Administrative Order provided that Ms. Hickox would be quarantined "until it is determined that she does not present a danger to the public health." (*Id.*) The Order advised that a person who is quarantined can seek relief by emailing or writing to the Office of Legal and Regulatory Compliance at the DOH. (*Id.* p. 3) It also provided a phone number for additional information. (*Id.*) The Order was to remain in effect until further order of the DOH Commissioner, or until the termination of a proceeding seeking relief.

Sometime in the evening, Hickox received a call from a DOH employee asking whether she had received a signed copy of a quarantine order. (*Id.* ¶ 63) Hickox said she had not, and the unidentified employee said that he or she would get Hickox a copy. (*Id.*)

**Saturday October 25, 2014**

Around 3:14 a.m. on Saturday, October 25, 2014, O'Dowd received emailed results of Hickox's blood work from the Public Health Laboratory of the New York City Department of Health and Mental Hygiene. Those results indicated that Hickox had tested negative for Ebola. (*Id.* ¶ 65) A DOH epidemiologist nevertheless recommended keeping Hickox in isolation for 72 hours to permit observation. (*Id.* ¶ 67) Later that morning, Hickox asked to take a shower and was given water for a sponge bath. (*Id.* ¶ 68) She requested clean clothes and was given paper scrubs. (*Id.*)

At around 12:00 p.m., The Dallas Morning News published an interview with Hickox regarding her experience in quarantine. (*Id.* ¶ 69) Later that afternoon, Governor Christie made a public statement in which he allegedly described Hickox as "ill." (*Id.*) Around 3:14 p.m., the DOH received results from

the CDC's lab, also reflecting that Hickox had tested negative for Ebola. (*Id.* ¶ 70 ("Ebola RT-PCR was negative."))

At around 4:00 p.m., Hickox found a copy of the Administrative Order of quarantine, described above, on top of a portable handwashing station in her tent. (*Id.* ¶ 72) At around 6:00 pm, Hickox received a call from defendant Rinn. (*Id.* ¶ 87) Hickox asked Rinn what would happen to her. He replied that he did not have an answer and would get back to her. (*Id.*) Later that evening, an MSF employee brought Hickox warm clothes. (*Id.* ¶ 91) The employee was not allowed to enter the tent to visit Hickox. (*Id.*)

**Sunday October 26, 2014**

At around 7:30 a.m. on October 26, 2014, Hickox asked to speak with her lawyer. (*Id.* ¶ 93) At around 5:00 p.m., Hickox's lawyers were allowed into the area outside Hickox's tent. They spoke to her through a window. (*Id.* ¶ 95)

At around 6:00 p.m., Hickox received a call from Rinn to discuss the next steps. Hickox felt that Rinn did not adequately explain why she was being held, and she told Rinn to contact her lawyer. (*Id.* ¶ 94)

**Monday, October 27, 2014**

At around 11:00 a.m. on October 27, 2014, hospital staff members entered the isolation tent without protective gear, shook Hickox's hand, and told her she was being released. (*Id.* ¶ 97) Around 1:30 p.m., Hickox left the hospital and was driven to Maine, where she then resided, by Emergency Medical Technicians. (*Id.* ¶ 98).

## II. MOTION TO DISMISS STANDARD

FED. R. CIV. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140

F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

FED. R. CIV. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' … it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

## III. FEDERAL CLAIMS: QUALIFIED IMMUNITY

Plaintiff's federal claims, Counts 1, 2, and 3, are brought pursuant to Section 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Thus, to sufficiently set forth a Section 1983 claim, a complaint must allege the violation of a right secured by the Constitution or laws of the United States, and that the alleged violation was committed by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citations omitted); *see also West v. Atkins*,

487 U.S. 42, 48 (1988). Defendants contend that the Section 1983 claims should be dismissed in their entirety on the grounds of qualified immunity. For the reasons expressed in this section, I agree.

### A. Qualified Immunity Standards

"[Q]ualified immunity shields government officials from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Schneyder v. Smith*, 653 F.3d 313, 331 (3d Cir. 2011) (internal quotations and citations omitted); *see also Mammaro v. New Jersey Div. of Child Protection and Permanency*, 814 F.3d 164, 170 (3d. Cir. 2016) (noting that in circumstances where "the failure to act quickly and decisively ... may have devastating consequences" qualified immunity exists "unless clearly established law puts [officials] on notice that their conduct is a violation of the Constitution").

Qualified immunity issues (such as whether a violation was "objectively apparent" under the circumstances at the time) may require the kind of factual context that is available only on summary judgment or at trial. Nevertheless, when a qualified immunity issue is raised on a motion to dismiss, the Court is obligated to address it. "'[U]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985)). As *Thomas* implies, at the pleading stage such a clear violation need be alleged, not proven. "The focus of the qualified immunity inquiry is on the allegations ...." *Lagano*, 769 F.3d at 859.

The qualified immunity analysis has two parts:

9

(1) The court must "determine whether the facts, and inferences drawn therefrom, taken in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right." *McGreevy*, 413 F.3d at 364 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001)). This step is functionally equivalent to the standard employed on a Rule 12(b)(6) motion to dismiss.

(2) The court must "determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Id.* (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)). This step requires "that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent." *McGreevy*, 413 F.3d at 366 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692 (1999)). *See also Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508 (2002).

The court has the discretion to analyze the steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009) (partially overruling *Saucier, supra,* and no longer requiring courts to determine issues (1) and (2) in that order). The parties direct their arguments to the second stage of the analysis, whether the defendants' conduct violated a constitutional right that was "clearly established." I do the same, although the analysis of either step is necessarily intertwined with that of the other.

### B. Quarantine Case Law

To assess whether defendants' actions violated clearly established law, I look first to existing precedent involving quarantine and related public health measures. I find that this case law would not have placed the defendant officials on notice of a clear violation of Hickox's constitutional rights. It authorizes preventive detention of a person exposed to others who suffer from a contagious, dangerous disease. Within broad boundaries, the length of such detention is a judgment call, calling for the application of expertise; there is no bright-line statutory or constitutional rule. (I consider an independent Fourth Amendment analysis in the following section.)

The federal government possesses the power to declare and enforce a quarantine. That power, based on the commerce clause, would appear to be at its zenith with respect to preventive measures at the border. Section 361 of the Public Health Service Act provides that "[t]he Surgeon General, with the approval of the Secretary [of Health and Human Services], is authorized to make and enforce such regulations as in his [sic] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264. Authority to carry out these functions has been delegated to the Centers for Disease Control and Prevention (CDC). "Under 42 Code of Federal Regulations parts 70 and 71, CDC is authorized to detain, medically examine, and release persons arriving into the United States and traveling between states who are suspected of carrying these communicable diseases." CDC website, www.cdc.gov/quarantine/aboutlawsregulationsquarantineisolation.html. [2]

In response to the Ebola outbreak, the CDC promulgated interim guidelines for screening. The CDC's Interim Guidance recognizes the unfortunate risk of infection, even among trained healthcare workers:

> The high toll of Ebola virus infections among healthcare workers providing direct care to Ebola patients in countries with widespread transmission suggests that there are multiple potential sources of exposure to Ebola virus in these countries, including unrecognized breaches in PPE, inadequate decontamination procedures, and exposure in patient triage areas. Due to this higher risk, these healthcare workers are classified in the some risk category, for which additional precautions may be recommended upon their arrival in the United States.

(ECF no. 16-2 ("CDC Guidance") at 6)[3]

---

[2]     To be clear, Hickox does not challenge the constitutionality of any statute or regulation, but rather challenges the basis for the decision to quarantine her.

[3]     The CDC Guidance is properly cited here, because it is relied upon and referred to in the complaint. See Santomenno, 768 F.3d at 291, supra n.1. At any rate, I do not need to make any finding as to its accuracy; I simply note that the authorities could reasonably have relied on it. See infra.

Federal quarantine orders, as such, have been comparatively rare. Since as long ago as 1799, however, federal legislation has mandated federal noninterference and cooperation with the states' execution of their quarantine laws. *See Morgan's La. & T.R. & S.S. v. Bd. of Health of State of La.*. 118 U.S. 455, 464–65, 6 S. Ct. 1114 (1886) (citing Act of 1799, c. 53, Rev. Stat., and 1878, 20, Stat. 37, in the course of upholding state quarantine law designed to protect State against introduction of disease by seagoing and Mississippi River vessels). In the modern era, the CDC has most commonly played a supportive role, with the States taking the lead in quarantine matters. *See* CDC website, *supra.*

That is what happened here. After an initial screening at the CDC Quarantine Station, the State of New Jersey took over, in accordance with the EPP. Ms. Hickox was detained by the Department of Health (DOH), pursuant to state law. By statute, the DOH or a local board of health has the power to:

> Maintain and enforce proper and sufficient quarantine, wherever deemed necessary ... [and] Remove any person infected with a communicable disease to a suitable place, if in its judgment removal is necessary and can be accomplished without any undue risk to the person infected.

N.J. Stat. Ann. § 26:4-2(d)-(e). The administrative rule cited by the State to justify Ms. Hickox's quarantine reads as follows:

> The Department or health officer may, by written order, isolate or quarantine any person who has been exposed to a communicable disease as medically or epidemiologically necessary to prevent the spread of the disease, provided such period of restriction shall not exceed the period of incubation of the disease.

N.J. Admin. Code § 8:57-1.11(c).

More than a century ago, the United States Supreme Court upheld such exercises of the states' general police powers to protect public health through quarantines and other measures. *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25, 25 S. Ct. 358 (1905) (recognizing the "authority of a state to enact quarantine laws and health laws of every description") (internal quotations and citations omitted); see *also Compagnie*

*Francaise de Navigation a Vapeur v. La. State Bd. Of Health*, 186 U.S. 380, 387 (1902)("[T]he power of States to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants ... is beyond question."); *Ogden v. Gibbons*, 22 U.S. (9 Wheat.) 1, 203 (1824) (dicta that a state has the power "to provide for the health of its citizens" by quarantine laws).

In *Jacobson*, for example, the Court upheld a Massachusetts law requiring vaccination against smallpox. *Id.* at 39. The Court held that such a measure, enacted to protect public health, will not be struck down unless it "has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights" secured by the Constitution. *Id.* at 31. To uphold that law, the Court analogized to the unquestioned power to quarantine even an outwardly healthy individual entering the United States:

> An American citizen arriving at an American port on a vessel in which, during the voyage, there had been cases of yellow fever or Asiatic cholera, he, although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will on board of such vessel or in a quarantine station, until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared.

*Id.* at 29. Courts facing similar public health issues have recognized that the authorities possess similarly broad discretion.

Thus *Reynolds v. McNichols*, 488 F.2d 1378 (10th Cir. 1993), relying in part on *Jacobson*, upheld an ordinance "authorizing limited detention in jail without bond for the purpose of examination and treatment for a venereal disease of one reasonably suspected of having a venereal disease" as a valid exercise of the police power. *Id.* at 1383.

In *U.S. ex rel. Siegel v. Shinnick*, 219 F. Supp. 789 (E.D.N.Y. 1963), the court permitted the quarantine of a woman who had arrived in the U.S. from Stockholm (deemed "a small pox infected area") without presenting a certificate of vaccination. *Id.* at 790-91. The court upheld an administrative order that she be quarantined for 14 days, the length of the smallpox incubation period. *Id.* It

acknowledged that public health officials "deal in a terrible context [where] the consequences of mistaken indulgence can be irretrievably tragic." A better-safe-than-sorry determination was therefore entitled to deference, absent a "reliable showing of error," *id.* at 791:

> Their conclusion, reached in obvious good faith, cannot be challenged on the ground that they had no evidence of the exposure ... to the disease; they, simply, were not free and certainly not bound to ignore the facts that opportunity for exposure existed during four days in Stockholm, that no one on earth could know for fourteen days whether or not there had been exposure ....

*Id.*

Courts have sometimes struck down quarantine orders, however, when they were found to be arbitrary and unreasonable in relation to their goal of protecting the public health. *In Jew Ho v. Williamson*, 103 F.10 (C.C.D. Cal. 1900), the court found that sealing off an entire section of San Francisco to prevent the spread of the bubonic plague was "unreasonable, unjust, and oppressive." *Id.* at 26. Such an overbroad order, the court declared, was "not in harmony with the declared purpose" of preventing the spread of the disease. *Id.* at 23.[4]

Overbreadth was of similar concern in *In re Smith*, 101 Sickels 68, 76, 40 N.E. 497 (N.Y. 1895). There, the New York Court of Appeals rejected the blanket quarantine of individuals who refused vaccination, when there was no reason to believe they had been infected or even exposed to that disease.

Building on the principles of such cases, Hickox argues that the initial decision to quarantine her did not bear a "real or substantial relation" to

---

[4]    The rationale for the quarantine was also suspect on its own terms. The section to be sealed off consisted of San Francisco's so-called Chinatown, and the court found the quarantine to be discriminatory because it targeted people of Chinese origin. *Id.* at 23. In *Compagnie Francaise, supra*, the rationale (although upheld) was perhaps similarly suspect; the dissent notes that the "quarantine" did not apply to the ship, but rather purported to isolate entire parishes in Louisiana, in effect excluding immigrants from entering. *See* 186 U.S. at 398–99 (Brown, J., dissenting). There is, in the fact patterns of the old cases, a lamentable tinge of xenophia; declarations of quarantine seem to have borne some relation to exclusionary sentiment. No such issue is pressed by the parties here.

protection of the public health, but instead was "arbitrary and oppressive." (ECF no. 15 p. 34) At a minimum, she says, her quarantine became arbitrary and oppressive in the early hours of October 25, 2014, when her first blood test results came back negative for Ebola. She argues that the DOH epidemiologist's subsequent recommendation that she be held for 72 hours for further observation was "entirely arbitrary, related neither to the incubation period nor to any symptoms displayed by Hickox at the time." (*Id.*)

I sympathize with Hickox's plight, but I cannot find that her isolation violated any clearly established constitutional principle embodied in quarantine case law. Of course, even as to a dread disease, it is possible to overreact; as it was with cholera and yellow fever, so it is with Ebola today. A restriction can be so arbitrary or overbroad as to be impermissible. The parties cite no case striking down a quarantine order, however, that is even close to Hickox's factual scenario, or that would have clearly indicated to any of these defendants that their actions violated established law.

Hickox was returning from treating patients in a country then ravaged by an Ebola epidemic, thankfully now under control. The disease is a very serious one, and there is no vaccine or medicine to prevent or cure it. *See* www.cdc.gov/vhf/ebola/treatment/index.html. ("No FDA-approved vaccine or medicine (e.g., antiviral drug) is available for Ebola.")[5] The State could reasonably have thought that prevention and containment were therefore paramount.

True, Ms. Hickox was not a patient, but a health care worker, and she was trained in the avoidance of infection. She alleges that she wore protective gear and took other appropriate measures to prevent the spread of the disease to herself or others. The authorities were not required, however, to take it on faith that Ms. Hickox had been 100% compliant, or the measures 100% effective. Exposure, or at least the risk of exposure, was conceded; she worked in close proximity to Ebola patients and other health care workers. Hickox

---

[5]     The best hope, it seems, is to keep the patient alive and hydrated while the immune system fights off the infection. *See id.*

returned to the United States just two days after having left Sierra Leone; if she had contracted an infection close to the end of her stay, she would have been in the very early, asymptomatic days of the incubation period. At the CDC quarantine station, Hickox was questioned regarding the nature and timing of her work in Sierra Leone. Based on her answers, DOH officials decided to detain her for further evaluation. Very early in her detention, certain thermometer readings reflected that she had an elevated temperature, and some continued to reflect a fever for a relatively short time thereafter. Other readings, however, did not; the main divergence seems to have been between the temporal and oral thermometer measurements. The allegations do not indicate that any other cause for the elevated temperature readings was identified.

On such facts, I cannot find that the decision to quarantine Hickox for a limited additional period of observation violated clearly established law of which a reasonable officer would have been aware. The facts do not suggest arbitrariness or unreasonableness as recognized in the prior cases—*i.e.*, application of the quarantine laws to a person (or, more commonly, vast numbers of persons) who had no exposure to the disease at all. Indeed, her quarantine fits well within the Supreme Court's dicta in *Jacobson*, as well as the holdings in *Reynolds* and *Shinnick*. In *Reynolds*, the court authorized a short detention for the purpose of assessing whether an at-risk individual had the disease at issue. In *Shinnick*, the individual was held for the incubation period of the disease (14 days) to rule out her infection with smallpox during her travel in an infected area. In short, given the important public interests at stake, the cases give the authorities a great deal of leeway to detain persons who may turn out not to have been sick at all. Here, Hickox was quarantined, in total, for approximately 80 hours, and released well before the expiration of even the shortest estimate of the incubation period (8 days). *Pace* Hickox's argument, that a 72 or 80 hour quarantine is "unrelated" to the incubation period would seem to support a longer, not a shorter, quarantine period. It tends to suggest that the response of the authorities was measured and

reasonable, not arbitrary.

For the same reasons, I cannot find that the continued detention of Hickox following her negative blood results constituted a violation of clearly constitutional or statutory law. The State wished to determine whether Ms. Hickox's symptoms would worsen, and remained concerned that she had previously registered a fever. That fever, for all that appears in the pleadings, remains unexplained. Once again, we are not in the extreme situation where a judgment call becomes a clear and unmistakable error. *See Reynolds*, 488 F.2d 1383; *Shinnick*, 219 F. Supp. at 790 (expressing deference to the judgment of public health officials dealing in emergency situations that carry serious consequences). To permit these constitutional claims to go forward would not be an implementation of clearly established law; it would be a judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not my) expertise.

In sum, I do not find that prior quarantine case law establishes any unconstitutionality, much less a violation of clearly established rights. To the extent that the Fourth Amendment may impose an independent limitation, I analyze it under the civil commitment case law, where the doctrine is more developed.

### C. Civil Commitment Case Law

Plaintiff also argues that civil commitment case law put defendants on notice that their conduct violated clearly established law. Defendants reply that this body of law—analogous at best, and arising in a distinct factual context—did not provide the kind of notice required to defeat qualified immunity. I nevertheless consider it, to the extent it might have suggested to the defendants that their conduct violated Ms. Hickox's rights.

To defeat qualified immunity, a plaintiff need not demonstrate that the defendants' precise conduct has previously been declared unconstitutional. "The ultimate question … is whether the defendant had 'fair warning' that his conduct deprived his victim of a constitutional right." *Schneyder*, 653 F.3d at 329. (citations omitted). On the other hand, "a constitutional duty is not clearly

17

established simply because of the existence of a broad imperative." *Id.* It is not enough to state, for example, that it was "clearly established" that liberty and property may not be taken without due process of law. "[T]he usual rule is that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Id.* (internal quotations and citation omitted). "[W]hether "a new scenario is sufficiently analogous to previously established law to warn an official that his/her conduct was unconstitutional" depends on "whether the official should have related this established law to the instant situation." *Id.* at 330 (internal quotations and citations omitted).

In such a context, to say that officials should have analogized from a parallel body of case law is highly problematic. The parties have not cited any case, and the court is not aware of any, in which an analogy to civil commitment law was found sufficient to strip the quarantining authorities of qualified immunity.[6] The analogy, moreover, seems to be an imperfect one. The

---

[6]     Plaintiff does cite some state cases and one federal case that looked to civil commitment case law for analogous guidance on the issue of quarantine. These cases do not however, address the qualified immunity determination of whether civil commitment case law would put reasonable officers on notice that a temporary quarantine for observation was not permissible in this case.

In *Best v. St. Vincent's Hosp.*, Civ. No. 03-365, 2003 WL 21518829 (S.D.N.Y. July 2, 2003), and 2003 WL 21767656 (S.D.N.Y. July 30, 2003) (adopting Magistrate Judge's report and recommendation), *vacated in part on other grounds*, 115 F. App'x 459 (2d Cir. 2004), a tuberculosis patient challenged his detention beyond the period of several days permitted by State law without a court order, as well as his subsequent confinement pursuant to such an order. The court required, for example, an individualized assessment of the person's ability or willingness to comply with an 18 to 24 month course of treatment that would safeguard himself and the community. At the time of the court's decision, the plaintiff had apparently been involuntarily hospitalized for some six months after he lodged an objection. The situation here—a three day detention at the border for observation—is quite different, and *Best* would not have alerted defendants that it was impermissible.

*Greene v. Edwards*, 263 S.E.2d 661 (W. Va. 1980), a habeas corpus petition for release from quarantine, was a challenge to the procedures under the West Virginia Tuberculosis Control Act. That act permitted commitment of a person suffering from infectious tuberculosis upon a certification by a physician or health official that the "such person is unable or unwilling to conduct himself and to live in such a manner as not to expose members of his family or household or other persons with whom he may be associated to danger of infection." *Id.* at 662. Once again, at issue was a

civil commitment power permits the state to execute a quasi-arrest and includes the power to involuntarily hospitalize a citizen, sometimes for an indefinite period of years. The civil commitment precedents must therefore be applied with great care to the traditional and unquestioned power to detain persons coming from an area of infection at the border for a limited time, as a prophylactic measure. Nevertheless, particularly to the extent that they discuss more general Fourth and Fourteenth Amendment concerns, these cases have relevance, and I discuss them here.

## 1. Fourth Amendment limits

Civil commitment is subject to the Fourth Amendment, which guards against "unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City, Utah v. Stuart*, 54 U.S. 398, 403, 126 S Ct. 1943 (2006).[7] In the civil commitment context, "it is not unreasonable to temporarily detain an individual who is dangerous to himself or others." *Cole v. Town of Morristown*, 627 Fed. App'x 102, 106 (3d Cir. 2015). The standard is one of probable cause. *See also Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)("The Fourth Amendment requires an official seizing and detaining a person for psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others.") Probable cause for emergency civil commitment exists

---

formal, potentially long-term commitment, which the court found required a hearing, counsel, and other safeguards. Among the things to be proven was that the plaintiff in fact suffered from the disease in its infectious form. This case has no straightforward application to a temporary detention at the border in order to determine whether a person has a disease at all.

*City of Newark v. J.S.*, 652 A.2d 265 (N.J. Super. Ct. Law Div. 1993), read into the state's tuberculosis control statute certain modern standards of due process before a person could be involuntarily committed.

[7]   Many a search or seizure which would be unreasonable within the United States is considered reasonable as an effort to interdict contraband at the border. *See generally United States v. Montoya de Hernandez*, 473 U.S. 531, 539-40 (1985); *United States v. Kiam*, 432 F.3d 524, 529-30 (3d Cir. 2006); *United States v. Ezeiruaku*, 936 F.2d 136, 140-41 (3d Cir. 1991). Because Ms. Hickox's claims involve a detention of the person, however, I will exercise caution and analyze them on their own terms, relative to the domestic civil commitment case law.

where "there are reasonable grounds for believing that the person seized is subject to the governing legal standard." *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992); *see also Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012) ("[P]robable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm.") Shorter detentions require "less compelling" evidence of dangerousness. *Villanova*, 972 F.2d at 796. Similarly, the larger "the magnitude of the harm the person may do if left at large, the stronger is the case for commitment." *Id.*

For the "governing legal standard" the parties look to the New Jersey administrative code provision cited above (and in Hickox's quarantine order):

> The Department or health officer may, by written order, isolate or quarantine any person who has been exposed to a communicable disease as medically or epidemiologically necessary to prevent the spread of the disease, provided such period of restriction shall not exceed the period of incubation of the disease.

N.J. Admin. Code § 8:57-1.11(c). This provision is relevant to Ms. Hickox's detention, whether viewed through the lens of quarantine or civil commitment. The question here, as presented by the parties, is whether the authorities had probable cause to believe that standard was met.

I fail to see a lack of probable cause so clear as to overcome the officials' qualified immunity. As discussed *supra*, plaintiff was returning from a country experiencing a severe Ebola epidemic, and she was consistently engaged in Ebola-related care while in Sierra Leone. It would not have been unreasonable for a public health official to believe that she had been "exposed" to Ebola. *See id.* Exposure does not necessarily equate to infection, but temporary quarantine is authorized based on a risk, or potential, for infection, not proof of infection itself.[8] Nor was it unreasonable that health officials remained

---

[8]     The parties, in their briefs, dispute whether blood tests at this early stage are definitive, but such medical issues surpass the scope of what I may consider on a motion to dismiss, and I do not consider them.

concerned, even following Hickox's favorable blood work, because she had repeatedly registered a fever, for which no other explanation has been given.

Other factors found relevant to civil commitment support a finding of probable cause. *See Villanova, supra.* Ms. Hickox was not institutionalized on an ongoing basis; she was detained for approximately 80 hours. The fever appeared very early on, a few hours into the detention period. The magnitude of the harm that could have occurred had she been released, weighed against the relatively short period of detention,[9] also weighs in favor of finding that the detention was supported by probable cause. *See id.*

Ms. Hickox argues that her compliance with anti-infection protocols in Sierra Leone should have indicated to any reasonable officer that she was not infected, and defeated probable cause. As noted above, this argument presupposes that the health officials were required to take at face value her statements, as well as to assume that such measures were fail-safe. The CDC's Interim Guidance recognizes the unfortunate risk of infection, even among trained healthcare workers. (CDC Guidance, ECF no. 16-2 at 6, quoted at p. 11, *supra.*) Indeed, the CDC suggested direct active monitoring for such healthcare workers, even if asymptomatic, while noting that "[t]he public health authority, based on a specific assessment of the individual's situation, will determine whether additional restrictions are appropriate." CDC Guidance at 9.[10] For healthcare workers showing symptoms, "rapid isolation" is recommended. *Id.*[11] The risk of such infection only underscores the

---

[9]     "Short," that is, in relation to many an involuntary civil commitment. I do not minimize the annoyance and inconvenience of a three-day isolation.

[10]     While the "additional restrictions" do not specifically refer to quarantine, they include "controlled movement" and "exclusion from public places," and they note that "other activities should be assessed." CDC Guidance at 9. In any event, the CDC Guidance contains recommendations, and it notes the importance of public health officials' exercise of their judgment. (*Id.*)

[11]     Plaintiff also points to *In re Smith* to argue that defendants needed to demonstrate actual exposure as opposed to the risk of exposure. 101 Sickels 68, 40 N.E. 497 (N.Y. 1895). The definition of exposure in New Jersey's administrative provisions is not governed a New York state case. In any event, *Smith* certainly cannot

21

admirability of what Nurse Hickox did; it also, however, provides justification for the actions of the authorities.

Applying analogous civil commitment case law, I do not find that plaintiff's border quarantine constituted a clear violation of her Fourth Amendment rights that would have been apparent to any reasonable officer, exposing that officer to a claim for damages under § 1983.

### 2. Fourteenth Amendment requirements and civil commitment procedures

The Fourteenth Amendment provides in relevant part that no state shall "deprive any person of life, liberty or property without due process of law." U.S. Const. amend. XIV. The "touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708 (1998) (internal quotations and citations omitted). The Supreme Court has recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804 (1979); *see also In Vitek v. Jones*, 445 U.S. 480, 492, 100 S. Ct. 1254 (1980)(transfer of state prisoner to a mental hospital implicates due process); *O'Connor v. Donaldson*, 422 U.S. 563, 575, 99 S. Ct. 2486 (1975)(mentally ill individuals cannot be confined if they are not dangerous).

Plaintiff argues that civil commitment case law demonstrates that defendants' conduct in this case violated clearly established principles of substantive and procedural due process. Again, I do not find that the relevant case law should have placed defendants on notice that their conduct was a clear violation of Hickox's rights.

### a. Substantive Due Process

The threshold question for a potential substantive due process violation is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."

---

provide the type of clearly established case law capable of defeating qualified immunity.

*See Benn v. Universal Health System, Inc.*, 371 F.3d 165, 174 (3d Cir. 2004) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847, n.8, 118 S. Ct. 1708 (1998)). Plaintiff does not argue—nor does she point to any case law establishing—that defendants' conduct in this case clearly shocks the conscience. Rather, for the reasons discussed previously, I find that under existing law a reasonable officer could have believed that a temporary quarantine for observation was appropriate, and not conscience-shocking.

Plaintiff contends that civil commitment law makes clear that her substantive due process rights were violated in three specific ways: (1) that she did not receive an individualized assessment, (2) that she did not receive the least restrictive means of treatment, and (3) that the nature and duration of her confinement were not reasonably related to public health.

### i. Individualized assessment

Plaintiff argues that she did not receive an individual assessment before being quarantined. She cites *Best v. St. Vincent's Hospital*, Civ. No. 03-0365, 2003 WL 21518829 (S.D.N.Y. July 2, 2003), 2003 WL 21767656 (S.D.N.Y. July 30, 2003) (adopting Magistrate Judge's report and recommendation), *vacated in part on other grounds*, 115 F. App'x 459 (2d Cir. 2004).[12] *Best* held that an individual with tuberculosis could not be involuntarily detained without "an individualized assessment" of whether he was likely to take his medication as directed; it found that such analysis was required in order to determine whether the patient "would constitute a danger to society," and thus could be confined. 2003 WL 21518829 at *7.

Plaintiff does not cite any other civil commitment cases using the "individualized assessment" language, much less any case law delineating the specific contours of such an assessment. That lack of a clear body of case law would itself seem fatal to the argument that there was a clearly established constitutional violation.

I will nevertheless assume without deciding that the *Best* "individualized

---

[12]   Although *Best* is a decision involving quarantine, it discusses and relies on civil commitment case law.

assessment" of the individual's illness and ability or willingness to abide by treatment can, *mutatis mutandis,* be adapted to the situation of a temporary detention for observation based on a risk of infection. I nevertheless disagree with the plaintiff's contention that she did not receive an individual assessment suited to the circumstances. The complaint alleges that after Ms. Hickox told immigration personnel that she was arriving from Sierra Leone, she was questioned by numerous people, including an official from the CDC, for approximately 90 minutes. (Cplt. ¶¶ 33-37) Her temperature was also taken; although she did not initially register a fever, temperature measurements taken soon afterward did register a fever. (*Id.* ¶ 31) This level of observation, discussion, and interaction with public health officials for an extended period of time was not a generalized conclusion about the risk of Ebola; it was an individualized assessment of plaintiff's situation and her potential risk to the public.

In that connection, I consider also the CDC's recommended protocol for asymptomatic individuals falling into the "some risk" category (plaintiff places herself in that category).[13] The CDC recommends that public health officials make "a specific assessment of the individual's situation" that includes factors such as the "intensity of exposure (e.g., daily direct patient care versus intermittent visits to an Ebola treatment unit)" and the "point of time in the incubation period (risk falls substantially after 2 weeks)." CDC Guidance at 5. Those are precisely the factors that the officials assessed when they questioned Hickox and ascertained that she had engaged in daily patient care as recently as two days before.

Moreover, it appears that Hickox's condition was continually reassessed throughout her quarantine. Blood was taken, and her temperature was taken repeatedly, at times reflecting a fever. Thus, while plaintiff may disagree with

---

[13]   Plaintiff takes issue with the fact that her quarantine order stated that she was at "high risk" of being exposed to Ebola. (ECF no. 1-1 p. 2) I note again that the CDC Guidance contains recommendations for assessing individuals' risk level. Moreover, it is not at all clear that the state DOH's reference to "high risk" was intended to correspond to the CDC's method of categorization.

the outcome of her individual assessment, I cannot find that she did not receive one.[14] And even an erroneous application of CDC guidelines does not correspond to a constitutional cause of action.

### ii.  Least restrictive means

The concept of a "least restrictive means" test comes from the Supreme Court's decision in *Shelton v. Tucker*, 364 U.S. 479, 81 S. Ct. 247 (1960). In *Shelton*, the court struck down a law that required teachers to file yearly affidavits listing every organization to which they belonged or contributed in the preceding five years. The Court held that even a legitimate government purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 488.

Plaintiff cites a handful of out-of-Circuit cases that apply *Shelton*'s reasoning in the civil commitment context. *See e.g., Lynch v. Baxley*, 744 F.2d 1452, 1458 (11th Cir. 1984)(detaining individuals in jail pending civil commitment proceedings was not the least restrictive means of keeping society safe from such individuals); *Welsh v. Likins*, 373 F. Supp. 487, 502 (D. Minn. 1974) *aff'd*, 525 F.2d 987 (8th Cir. 1975)(recognizing a "constitutional duty on the part of State officials to explore and provide the least stringent practicable alternatives to confinement of noncriminals"); *see also* ECF no. 15 p. 19. The

---

[14]    Plaintiff appears to argue that the quarantine could not have been based on an indivualized assessment because it was, in her view, a blanket quarantine order for all healthcare personnel returning from Ebola-affected areas. She alleges that this is reflected in the "Additional Screening Protocols" that Governors Cuomo and Christie announced the afternoon of her quarantine, which called for a "mandatory quarantine" for returning healthcare workers. (Cplt. ¶ 42) I find that plaintiff's description of the facts of her quarantine, however, demonstrates that she was not subject to a blanket quarantine. Hickox does not allege that she was quarantined immediately upon alerting the immigration official to the fact that she was returning from Sierra Leone and had been treating Ebola patients. Rather, after making that disclosure, she was taken aside for extensive questioning, and even after that evaluation, she was "informed that she might be quarantined and was told to wait to hear from the New Jersey Department of Health." (*Id.* ¶¶ 29-40) A short time later, Hickox received a call from Ludwig informing her that the decision had been made that she would be quarantined. (*Id.* ¶ 40) The order of quarantine was directed to her personally. In addition, I note that Hickox has not alleged that any other healthcare workers were swept up in this alleged blanket quarantine at Newark Airport.

most recent example plaintiff cites is *Best*, an unreported case from the Southern District of New York. *Best*, 2003 WL 21518829 at *8. ("The existence of a substantial government interest is not enough to satisfy substantive due process however, unless the State utilizes the least restrictive means available to advance that interest.")

The case law regarding the least restrictive means requirement falls far short of a clear consensus capable of defeating qualified immunity in this case.[15] At any rate, assuming *arguendo* that such a principle of law exists and is controlling, I do not find that defendants clearly violated it on the facts alleged here.

The theoretical availability of less restrictive alternatives does not mean that they are appropriate for a particular individual. *See Best*, 2003 WL 21518829 at *8 (rejecting less restrictive alternatives for TB patient as "inappropriate" based on his past failure to take medication); *Welsch*, 373 F. Supp. at 502 (noting that a less restrictive alternative must be "practicable" under the circumstances and requiring officials to make "good faith attempts to place [individuals] in settings that will be suitable and appropriate to their mental and physical conditions while least restrictive of their liberties"). Such a determination is, at bottom, a judgment call.

Here, public health officials made a judgment regarding the appropriate means of containing the risk that Hickox had been exposed to or infected with Ebola, in light of the potential threat to the public. They found that quarantine

---

15      Indeed, defendants point, not to the least restrictive means test, but to a distinct body of case law relating to conditions of confinement. *See Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845 (1972), *infra; see also Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)(conditions of confinement of involuntarily committed individual are "presumptively valid" if made by a professional and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"); *Rennie v. Klein*, 720 F.2d 266, 270 (3d Cir. 1983)(applying *Youngberg*'s professional judgment standard instead of the least restrictive means test to assess when antipsychotic drugs may be constitutionally administered to an involuntarily committed mental health patient). It is not clear that this line of cases, rather than the other, would govern. But for qualified immunity purposes, that may be the point.

for a limited period, up to and including the incubation period, was appropriate and that "[l]ess restrictive alternatives would not be sufficient." (ECF no. 1-1 p. 3) That decision could be criticized, or portrayed as erroneous. I cannot find, however, that a reasonable officer would have to have known it was a violation of Hickox's rights to detain her temporarily rather than, for example, allow her immediately to return home and self-report any symptoms. A reasonable officer could have determined that, as a practical matter, "no less restrictive alternatives exist[ed] in this case." *Best*, 2003 WL 21518829 at *8.

### iii.  Nature and duration of confinement

"At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 736, 92 S. Ct. 1845 (1972) (holding that a person charged with a criminal offense who is committed due to incapacity to proceed to trial cannot be held indefinitely on that basis alone); *see also Selig v. Young*, 531 U.S. 250, 265, 121 S. Ct. 727 (2001)(noting that "due process requires that the conditions and duration of confinement under [a civil commitment act] bear some reasonable relation to the purpose for which persons are committed").

Plaintiff contends that the nature and duration of her confinement did not bear a reasonable relation to protecting the public health once her first blood test results came back negative for Ebola. In support, Hickox points to the differences between the temporal and oral thermometer readings taken by health officials. She believes that these inconsistent readings called into question whether she was ill at all, and that the first blood test results confirmed that she was not. Her detention thereafter, she says, was not reasonable.

I do not agree that the nature and duration of Hickox's detention was clearly unreasonable and unrelated to protecting the public. Plaintiff takes issue with the variation in her temperature readings, but the bottom line is that some of these temperature readings reflected a fever. I cannot rule as a matter of statutory or constitutional law that these medical professionals

27

should have ignored the temporal thermometer readings and considered only the oral readings. Under the circumstances, the officials had to make a judgment, and they did so. The indications of fever are not attributed to some other, benign cause. Under the circumstances, ignoring indications of a fever in someone returning from working with Ebola patients in Sierra Leone could very well be deemed reckless.

Nor can I find that the DOH epidemiologist's recommendation that Hickox be held for observation for 72 hours after her first set of blood results was not reasonably related to protecting the public health. That, too, was a medical judgment made in light of Hickox's work in Sierra Leone and her temperature readings. Her quarantine following the blood results was not excessive. The results were received on Saturday, and her release was announced on Monday morning. I cannot say that this detention for additional monitoring and observation was objectively unreasonable. And a detention for a term that does not exceed the incubation period of the disease self-evidently bears a relation to the stated purpose of the quarantine—*i.e.,* to determine whether the disease was present.

### b. Procedural Due Process

Procedural due process requires that a deprivation of liberty be "accompanied by minimum procedural safeguards, including some form of notice and a hearing." *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 624, 94 S. Ct. 1895 (1974) (citing *Arnett v. Kennedy*, 416 U.S. 134, 164, 94 S. Ct. 1633 (1974)). A court considers three factors in assessing procedural due process: "(1) the private interest affected by the official action; (2) the risk that the plaintiff will suffer an erroneous deprivation through the procedure used and the probable value if any of additional procedural safeguards; and (3) the government's interest." *Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893 (1976). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (internal quotations and citation omitted).

Hickox argues that her procedural due process rights were violated by

the state's (1) failure to provide a hearing on her confinement and (2) failure to provide her with adequate notice of her rights.

### i. Right to a hearing

Plaintiff contends that she was entitled to a hearing in this case to assess whether her quarantine was "medically and epidemiologically necessary" to prevent the spread of Ebola. (ECF no. 15 p. 41) Without one, she argues that defendants' discretion inappropriately went unchecked.

Where practicable, due process generally requires notice and a hearing in advance of a deprivation of liberty. *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S. Ct. 975 (1990). In an emergency situation, however, a post-deprivation hearing is acceptable. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 582-83, 95 S. Ct. 729 (1975) (in emergency school suspension context, allowing for notice and a hearing "as soon as practicable"); *Benn*, 371 F.3d at 174 ("[I]n an emergency situation, a short-term commitment without a hearing does not violate procedural due process.") In such a case, the hearing should take place "as soon as practicable." *Goss*, 419 U.S. at 582-83; *see also In re Barnard*, 455 F.2d 1370, 1374 (D.C. Cir. 1971)(individual is entitled "to a hearing within a reasonable time to test whether the confinement is based on probable cause.").

Civil commitment case law does not establish a firm time frame within which a hearing must be held. Such a determination is dependent on the facts of the particular case, and courts have found varying lengths of time to be acceptable. *See, e.g., Project Release v. Prevost*, 722 F.2d 960, 975 (2d Cir. 1983)(providing hearing within five days of request for hearing); *Best*, 2003 WL 21518829 at *11 (same); *Aruanno v. Hayman*, 384 Fed. App'x 144, 150 (3d Cir. 2010)(preliminary hearing within twenty days of temporary civil commitment order); *Lynch v. Baxley*, 386 F. Supp. 378, 388 (M.D. Ala. 1974)(probable cause hearing within seven days of detention and full hearing within thirty days); *Barnard*, 455 F.2d at 1372 (permitting detention for 48 hours without a court order and requiring hearing within 24 hours of request for hearing).

Here, I cannot find that the failure to provide plaintiff with a hearing regarding her detention was a clear violation of due process. The entitlement to

29

a hearing must be understood in the context of an order of quarantine, which is necessarily prophylactic and peremptory. Plaintiff was released before such a hearing was required, or for that matter even practical. She was quarantined on a Friday afternoon and released on Monday, a period of approximately 80 hours. No body of clearly established quarantine or civil commitment case law establishes that she was entitled to a hearing within that timeframe. Once she was released from quarantine, the need for a hearing was mooted. Accordingly, I cannot find that any reasonable officer would have been aware that plaintiff's relatively short quarantine without a hearing was a violation of her constitutional right to due process.

### ii. Notice

Plaintiff also argues that the Quarantine Order did not adequately provide her with notice about what was happening to her or adequately explain her rights.

In relevant part, the Quarantine Order states as follows:

> Any person or persons subject to this Order may seek relief from the Commissioner from the provisions of the Order by making a written application within 10 days to the Office of Legal and Regulatory Compliance, New Jersey Department of Health, P.O. Box 360, Trenton, New Jersey 08625-360 or OLRC@doh.state.nj.us A person may obtain additional information by calling (609) 984-2177.

(ECF no. 1-1 p. 3)

Plaintiff raises a number of issues as to this section of the order. She argues that it is inadequate because: (1) the only recourse it identifies involves the Commissioner of DOH, rather than a neutral decision-maker; (2) it provides no timeframe during which the Commissioner must respond to a challenge to the quarantine; (3) it requires her to seek relief on her own initiative; and (4) it does not state that she has a right counsel. (*See* ECF no. 15 pp. 39-42)[16]

---

[16]   She also notes in passing that the order did not mention N.J. Admin. Code 8:57-1, Appx. B., under which plaintiff says she was entitled to immediate judicial review. (*See* ECF no. 15 p. 44 n.25)

Plaintiff has put forth civil commitment case law reflecting that a hearing before a judge or other neutral decision-maker is required within a relatively short time of confinement. *See supra.* In addition, the opportunity to be heard must be state-initiated. *See B.S. v. Somerset County*, 704 F.3d 250, 272 (3d Cir. 2013). There is a right to counsel[17] at civil commitment hearings. *See Project Release*, 722 F.2d at 976; *Barnard*, 455 F.2d at 1375-76.

Plaintiff has not, however, identified any authority reflecting that the failure to deliver complete, *Miranda*-style warnings in an initial confinement order is a *per se* violation of procedural due process. Procedural due process requires "some form of notice," *Mitchell*, 416 U.S. at 624, which is dependent on the particular facts of the situation, *see Matthews*, 424 U.S. at 334. *See also Goss*, 419 U.S. at 579 (in school suspension case, noting that the "content of the notice … will depend on appropriate accommodation of competing interests involved").

Relying on the *Matthews* factors, I note that the private liberty interest at issue here, freedom of movement, is significant. The risk of an erroneous deprivation is also present, though to some degree it is minimized by the fact that this confinement is tied to a disease with a specific incubation period; in other words, the confinement will at some natural point expire. Thus, the risk of an extended erroneous deprivation is less than in a case where indefinite civil commitment is sought. Finally, the government's interest is weighty, as it has a responsibility to protect its citizens from the spread of deadly communicable disease.

Keeping in mind these considerations, I do not find that Hickox's initial

---

[17]   In addition to her notice argument, Hickox also suggests that her counsel was prevented from meeting with her. (ECF no. 15 p. 40) The complaint, however, suggests otherwise. The relevant allegations are as follows: On Sunday morning, Hickox requested to see her lawyer. (Cplt. ¶ 93) She was told that the Department of Health had determined that she could have not have visitors. (*Id.*) Nevertheless, she gave her lawyer's contact information to a hospital employee. (*Id.*) Later that day, Hickox's lawyers met with her through the window in her isolation tent. (*Id.* ¶ 95) Thus, it appears that Hickox was permitted to meet with her lawyer the same day that she requested, albeit while observing the safety measures health officials had proscribed.

confinement order, on its face, violated due process. This was a unique, emergency situation, and the order was prepared on an expedited basis. In addition plaintiff's confinement was short—essentially encompassing a single weekend. The procedures, whatever they might or should have been, simply did not have the opportunity to play out.

For purposes of qualified immunity, I cannot find that any reasonable officer would have known that the quarantine order violated Ms. Hickox's right to procedural due process. The content of such an order does not appear to be clearly prescribed by civil commitment or quarantine case law.

In sum, I do not find that either the directly applicable quarantine case law or the analogous civil commitment case law placed defendants on notice that their conduct violated clearly established federal constitutional or statutory rights. Accordingly, defendants are entitled to qualified immunity with respect to plaintiff's federal Section 1983 claims, Counts 1, 2, and 3. The federal claims are therefore dismissed in their entirety.

### D. State Law Claims

I nevertheless retain jurisdiction over Hickox's state law claims. True, the prompt dismissal of all federal claims tends to undermine her assertion of supplemental subject matter jurisdiction under 28 U.S.C. § 1367. In the alternative, however, her complaint asserts diversity jurisdiction under 28 U.S.C. § 1332. (Cplt. ¶¶ 3, 4) It appears to be undisputed that, at the time of filing, the plaintiff was a citizen of Oregon,[18] the defendants were citizens of New Jersey, and the amount in controversy exceeded $75,000.

### 1.    False Imprisonment (Count 4)

The tort of false imprisonment requires (1) "an arrest or detention of the person against his or her will" and (2) "lack of proper legal authority or legal

---

[18]    Diversity is measured as of the time of filing of the complaint. Ms. Hickox also appears to have been a citizen of a state other than New Jersey (Maine) at the time of the events in suit.

justification." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 969 A.2d 1097, 1117 (2009) (internal quotations and citation omitted).

Defendants say that plaintiff cannot successfully allege such a claim because they are entitled to immunity under New Jersey's Tort Claims Act ("TCA"), N.J. Stat. Ann. § 59:3-1 *et seq.* The TCA governs public employee and entity tort liability under New Jersey law. Defendants invoke the TCA's "quarantine immunity" provision, which provides:

> Neither a public entity nor a public employee is liable for an injury resulting from the decision to perform or not to perform any act to promote the public health of the community by preventing disease or controlling the communication of disease within the community.

N.J. Stat. Ann. § 59:6-3. The comment accompanying this provision states:

> This section declares a specific rule of discretionary immunity for acts or omissions relating to quarantine or other similar measures for the prevention or control of communicable diseases. This rule is consistent with the recognized approach taken by the New Jersey courts. *See Valentine v. Englewood,* 76 N.J.L. 509, 71 A. 344 (E. & A.1908); *Bedrock Foundations, Inc. v. George H. Brewster & Son, Inc.,* 31 N.J. 124, 155 A.2d 536 (1959).

*Id.* This section appears to apply directly to quarantine decisions like the one taken here.[19]

The immunity provided by this section, however, is not absolute. It only applies where the official "exercised his [*sic*] judgment and discretion in good faith; it is "inapplicable where the administrative official's action was actuated by malice or bad faith." *Bedrock Foundation, Inc. v. George H. Brewster & Son, Inc.,* 31 N.J. 124, 140 155 A.2d 536 (1959); *see also Valentine v. Englewood,* 76 N.J.L. 509, 515, 71 A. 344 (E. & A.1908)(immunity not applicable in cases of "fraud or malice"); N.J. Stat. Ann. § 59:3-14 (stating that a public employee is not immune under the TCA if his conduct "constituted a crime, actual fraud, actual malice, or willful misconduct").

---

[19]     Unlike the § 1983 qualified immunity, the TCA's grant of immunity for an employee who "acts in good faith in the execution or enforcement of any law" is specifically withheld as to claims "for false arrest or false imprisonment." N.J. Stat. Ann. § 59:3-3. Defendants therefore do not invoke it.

TCA immunity, unlike qualified immunity, is an affirmative defense, and the burden of pleading and proving it rests on the defendants. *See Leang*, 198 N.J. at 582 ("[T]he public employee has the burden to plead and prove his immunity under the TCA.") (citing *Kolitch v. Lindedahl*, 100 N.J. 485, 497, 497 A.2d 183 (1985)); *see also Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991)("Under New Jersey law ... immunity under the State Tort Claims Act is regarded as an affirmative defense that must be pled by the public entity or employee.") (citing *Kolitch*).

Therefore, I find that application of TCA quarantine immunity at this stage is premature. I will allow this claim to proceed, and deny the motion to dismiss Count 4.

### 2.        Invasion of Privacy/False Light (Count 5)

The tort of false light, although couched as an invasion of privacy, has a "conceptual affinity" with defamation. *Romaine v. Kallinger*, 537 A.2d 284, 290 (N.J. 1988). This tort involves "publicity that unreasonably places the other in a false light before the public." *Romaine v. Kallinger*, 537 A.2d 284, 289 (N.J. 1988). The false light tort has two essential elements: "(1) the false light in which the other was placed would be highly offensive to a reasonable person," and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Leang v. Jersey City Bd. of Educ.*, 969 A.2d at 1116; *see also Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 766 (D.N.J. 1981). A "reckless disregard" of the truth requires that the speaker had a "high degree of awareness of [the statement's] probable falsity." *Durando v. Nutley Sun*, 37 A.3d 449, 458-59 (N.J. 2012) (internal quotations and citation omitted).

Hickox's false light claim is based on a public statement Governor Christie made on Saturday, October 25, 2014, less than 24 hours after Hickox's quarantine began. According to the complaint, Governor Christie,

without using Hickox's name,[20] stated that she was "obviously ill" and
continued:

> I'm sorry if in any way she was inconvenienced but inconvenience
> that could occur from having folks that are symptomatic and ill out
> amongst the public is a much, much greater concern of mine.

(Cplt. ¶ 69)

Plaintiff contends that a reasonable person would be highly offended by
falsely being described as "ill" with Ebola, and at being portrayed as a potential
or actual threat to the public. She also argues that the complaint supports the
contention that Governor Christie made these statements with reckless
disregard as to their falsity, because Hickox's initial set of blood results had
already come back negative and because her temperature readings were
"consistently showing that she was not ill." (ECF no. 15 p. 46).

The viability or not of this claim cannot be settled from the face of the
complaint.

The offensiveness and falsity, or not, of the imputation of illness must be
explored. The factual context may or may not establish that this was, directly
or by innuendo, a statement that Ms. Hickox herself had Ebola.[21]

The recklessness of the statement, too, will have to be explored in
discovery. At the time, medical professionals were apparently concerned that
Hickox might be ill. The allegations of the Complaint will bear the
interpretation, however, that no one had yet concluded that Hickox was in fact
ill and symptomatic. Of course the allegations of the complaint are allegations

---

[20]     Hickox apparently identified herself to the media by name. (*See* Cplt. ¶ 69
(alleging that Hickox gave an interview to The Dallas Morning News about her
experience)).

[21]     The imputation of a "loathsome disease" has some historical pedigree in the law
of defamation. At common law, in an action for slander, damages would be presumed
for an "accusation of a crime, a loathsome disease, misfeasance in business, or
serious sexual misconduct." *W.J.A. v. D.A.*, 43 A.3d 1148, 1154 (N.J. 2012). *A fortiori*,
such a statement may be regarded as offensive to the average person.

only, and defendants' side of the story has yet to be told. [22] Other issues, such as privilege, also remain to be explored.

For now, however, the motion to dismiss Count 5 is denied.

## IV.   CONCLUSION

For the foregoing reasons, I will grant the motion to dismiss Counts 1, 2, and 3 with prejudice, based on qualified immunity. The motion to dismiss Counts 4 and 5 is denied. An appropriate order is filed with this opinion.

Dated: September 2, 2016
Newark, New Jersey

**KEVIN MCNULTY**
**United States District Judge**

---

[22]     Indeed, plaintiff's brief, though not the complaint, mentions that Governor Christie stated at the press conference that her blood results had come back negative for Ebola. (*See* ECF no. 15 p. 46)